# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| KACY BUSH, *on behalf of J.B., a minor,* *and K.B., a minor*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  10-cv-1382 |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | |
| Defendant. | ) ) | |

# <u>O R D E R   &   O P I N I O N</u>

This matter is before the Court on Plaintiff's "Brief in Support of Claimant," which the Court construes as Plaintiff's Motion for Summary Judgment, and Defendant's Motion for Summary Affirmance. (Docs. 10 & 13). For the reasons stated below, Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and Defendant's Motion for Summary Affirmance is granted in part and denied in part.

### PROCEDURAL HISTORY

Plaintiff's decedent, John Bush, alleged that he was disabled by injuries to his right knee, left shin, and left ankle in a December 23, 2006 car accident.[1] (Tr. 702, 714). He claimed disability benefits on January 4, 2007, with an onset date of

---

[1]      John Bush was the original claimant, and it is his disability determination that is at issue here. He was killed in a car accident after the denial of his disability claim but prior to the filing of the instant appeal, and his ex-wife Kacy Bush was substituted on behalf of their minor children, J.B. and K.B., in November 2010. (11/29/2010 Text Order; Doc. 10 at 20).

December 23, 2006. (Tr. 14). The Social Security Administration denied his application initially and on appeal. (Tr. 24). Administrative Law Judge Joseph Warzycki held a hearing in the matter on March 2, 2009, and found that Bush was not disabled. (Tr. 697-728, 14-21). Following a denial of Bush's request for review by the Appeals Council on September 23, 2010, Plaintiff filed the instant appeal pursuant to 42 U.S.C. § 405(g) on November 19, 2010. (Tr. 4-6; Doc. 1).

## Relevant Medical History

Bush injured his head, right arm, and right leg in a car accident on December 23, 2006, and remained in the hospital until January 5, 2007. (Tr. 116). Dr. Ronald Wheeler, an orthopedic surgeon, performed several surgeries to repair his arm and leg while he was in the hospital initially, and remained his treating physician. (Tr. 117-212). On January 18, 2007, Bush reported to Dr. Wheeler that he was increasing his activity level, and was using a walker and a wheelchair. (Tr. 211). By February 1, 2007, he was using a forearm walker, and Dr. Wheeler had him begin an occupational therapy program. (Tr. 212, 227-29). On April 12, 2007, Bush's range of motion in his right arm was quite good, though on May 24, 2007, Dr. Wheeler noted that his right knee had a restricted range of motion. (Tr. 216-17).

On May 14, 2007, Dr. Ernst Bone, a state agency consultant, completed a Physical Residual Functional Capacity Assessment of Bush based on his medical records. (Tr. 316-23). Dr. Bone found that Bush could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and walk a total of six hours a day, sit about six hours a day, and push or pull limited only to the extent described in his ability to lift and carry. (Tr. 317). He found that there were no established postural,

manipulative, visual, communicative, or environmental limitations. (Tr. 318-20). Reviewing Bush's medical records for the first few months after the accident, Dr. Bone determined that Bush would be able to work by December 23, 2007, within a year of the accident. (Tr. 323). On June 2, 2007, Dr. Wheeler, apparently responding to the denial of benefits based on Dr. Bone's assessment, wrote a letter challenging the determination that Bush would be able to engage in sedentary work by December 23, 2007. (Tr. 218-19). Dr. Towfig Arjmand, another state agency consultant, reviewed Bush's records on August 9, 2007, and confirmed Dr. Bone's May 14, 2007 assessment, stating that, in spite of Dr. Wheeler's June letter, the "medical evidence does not show [that Bush will be disabled longer than 12 months] at this time." (Tr. 324-26).

In July 2007, Bush had a "marked improvement" in his ankle's range of motion, and reported only "some discomfort on occasion in the leg;" his knee's range of motion was still problematic (Tr. 350, 352). Later that month, Dr. Wheeler reported that Bush's range of motion in his knee and ankle were improving. (Tr. 348). At that time, Bush was exercising and had some pain in the morning and afternoon, and Dr. Wheeler recommended that he progress to full weight bearing on his right leg. (Tr. 348). In August 2007, Bush was still exercising and increasing his activities, and was in less discomfort. (Tr. 347). Bush's October 2007 visit with Dr. Wheeler found him "doing fairly well," with "no particular discomfort in the forearm;" Dr. Wheeler again recommended that he bear full weight on his right leg. (Tr. 346, 374). In December 2007, Bush was again "doing fairly well" and "increasing his activities," and Dr. Wheeler made arrangements for what was

expected to be Bush's last leg surgery other than a possible arthroscopy and takedown of scar tissue on the knee. (Tr. 344, 372).

After a January 18, 2008 surgery, Bush saw Dr. Wheeler on January 28, and was given a note to return to a modified work program. (Tr. 669, 340). In March 2008, Bush was "doing fairly well." (Tr. 339). In April, Dr. Wheeler noted that Bush was doing fairly well, had been increasing activities, and had not yet returned to work; Dr. Wheeler recommended that he intensify his activities and return to work in a "nonwork foreman-type position if available." (Tr. 338). In July 2008, though, Bush's range of motion in his knee had deteriorated, and he had some pain in the knee. (Tr. 337). Bush was admitted for arthroscopy to address the buildup of scar tissue that was restricting his knee's range of motion in late August 2008. (Tr. 335-36, 617-28). On September 3, 2008, Bush was taken by ambulance to the hospital with "intolerable post operative knee pain," but was doing much better by September 8. (Tr. 396, 332). Bush reported feeling "much better" in October, though he had no particular improvement in motion. (Tr. 329). Dr. Wheeler noted that he was walking without crutches and recommended that he continue to do so. (Tr. 329). By December 2008, Bush's right knee's mobility and strength were improved, and in February 2009 he was "not too bad as far as pain is concerned," with "more agility, more strength." (Tr. 327-28).

On February 22, 2009, Dr. Wheeler completed an assessment of Bush's ability to work at the request of the Social Security Administration. (Tr. 382-84). He opined that Bush, when engaging in sedentary work, would need several unscheduled rest periods or "any change in position of [right] knee even more

frequently," and would need to have the option of alternating between sitting and standing at will. (Tr. 383-84). Dr. Wheeler felt that Bush would have frequent and/or unpredictable absences from work due to his symptoms. (Tr. 383). He estimated that Bush would be able to lift, push, or pull ten pounds or less, and could stand or walk between zero and two hours a day. (Tr. 384). Bush "occasionally" used a cane or other assistive device to walk, according to Dr. Wheeler. (Tr. 384). He also reported that Bush would have no problem maintaining sustained attention and concentration, and that he could work with his arms constantly. (Tr. 383).

## Hearing Testimony

Bush, represented by his (now Plaintiff's) attorney, appeared via videoconference at a hearing on March 2, 2009, and testified as to his alleged disability before Administrative Law Judge Joseph Warzycki ("ALJ"). (Tr. 695-728). Vocational expert Dr. Magroski also appeared and gave testimony. (Tr. 723-27).

Bush testified that he lived in a one and a half story house, which required climbing three steps to enter. (Tr. 699-700). He lived there alone, except for when his two young daughters visited him every other weekend. (Tr. 700). Bush only drove to the store or to therapy. (Tr. 700). He was currently getting disability payments through his union, as well as food stamps, and was on Medicaid; he had collected unemployment benefits for six months, two years previously. (Tr. 701). Bush had graduated from high school, and had completed a three-year iron worker apprenticeship. (Tr. 702). He had worked for ten years as an iron worker, doing steel erection work. (Tr. 703). He had to work at heights in his previous work, and welded. (Tr. 704). Bush's previous work was very heavy work: he lifted 50-70

pounds on occasion. (Tr. 704). In the early 1990s, Bush worked as a laborer and concrete finisher. (Tr. 704-05).

Bush had last worked on December 22, 2006, the day before the car accident. (Tr. 702). He had not attempted to work since that time, and had not applied to work anywhere, as he felt that he could not work. (Tr. 703). Bush testified that he had a lot of pain in his leg when he works for any length of time, and that he then had to elevate it about six inches while sitting or lying down. (Tr. 703).

Following the car accident, Bush was in the hospital for two weeks, then had a cast on his arm and a brace on his leg for at least six or seven months. (Tr. 703). Since then, he had had several surgeries to remove scar tissue and to gradually remove hardware, though he indicated that the injury "seems to be healing up," and that his doctor had not wanted to schedule another surgery at his most recent visit. (Tr. 713). However, "nothing has really healed up completely yet." (Tr. 714). Bush had limited mobility in his right arm, but could reach out and reach above his head. (Tr. 714). His hands were unaffected, though he sometimes had pain turning his wrist. (Tr. 714-15). In addition to his physical injuries, Bush stated that his memory and concentration had been impaired after the accident, though doctors had examined him and found nothing wrong. (Tr. 715-17).

The ALJ asked Bush about his daily activities. (Tr. 706). Bush testified that he did his own laundry, cooking, dishes, bed-making, and housecleaning, though he took breaks to rest his leg. (Tr. 706). Bush also testified that he did his own grocery shopping, and could carry his grocery bags using his left arm. (Tr. 706). He had placed a shower stool to use in his shower after experiencing a couple of falls. (Tr.

711). Most of his days were spent watching television, and he did some physical therapy and housework at home. (Tr. 707). Bush's physical therapy involved bending his leg as much as possible, as well as using 10-15 pound weights on his knee, three to five times a day. (Tr. 707).

When Bush's daughters were with him for visitation every other weekend, he typically sat and watched them; he didn't do much with them. (Tr. 708). Bush's parents took his daughters to church on Sundays, as it was too difficult for him to bend his knee in church. (Tr. 709). Sometimes his friends would visit or get him out of the house. (Tr. 709). Bush's father or nephew typically mowed his lawn, as he couldn't bend his knee to get on the riding mower; Bush also testified that he generally mowed the lawn every couple of weeks. (Tr. 709-10). He testified that he was no longer able to continue his hobbies of gardening and hunting, though he did sometimes attempt to weed the garden. (Tr. 710). Bush had last gone fishing over two years previously, and had last camped more than three years previously. (Tr. 711).

Bush testified that he was currently taking Zoloft and Xanax. (Tr. 712). Both were prescribed for depression, anxiety attacks, and chest pains. (Tr. 712). Bush had previously taken Ativan for anxiety. (Tr. 712). These medications made him feel tired. (Tr. 715). Bush's depression had existed since the accident; he had suicidal thoughts and two or three panic attacks. (Tr. 716). Since he had been on medication, he no longer cried often, and his anxiety attacks had lessened, though he felt that they were beginning to recur. (Tr. 716). Bush had never been in a mental hospital, and was not under the care of a psychiatrist or psychologist. (Tr. 716).

When the ALJ inquired as to how far Bush could walk, he testified that he could not walk very far, with the perimeter of his three and a half acre lot being the maximum distance. (Tr. 717). Bush had no problem sitting in a chair, but indicated that he eventually needs to elevate his leg, as it begins to ache from his knee down to his ankle; he could put his leg up on a desk to elevate it while in a chair. (Tr. 717). He testified that he could stand for a maximum of a half-hour. (Tr. 717). Bush could lift 10-20 pounds with his right arm, though it hurt; he indicated no limitation on the amount he could lift with his left arm. (Tr. 718). He could not stoop, crouch, kneel, or crawl, though he could pick up an item that fell to the floor by moving to sit on the floor. (Tr. 718). To climb stairs, Bush typically held on to the railing and hopped on his good leg. (Tr. 718). The ALJ noted that Bush's doctor had noted in April of 2007 that his arm was stable and the forearm was quite good, and Bush stated that his condition had not deteriorated. (Tr. 718) However, Bush believed from the most recent X-rays that his arm and leg were not yet healed. (Tr. 718).

Upon questioning by his attorney, Bush described the surgeries that he had had since April 2007. (Tr. 719). He testified that he can engage in an activity for a half-hour before he had to rest and elevate his leg. (Tr. 719). Bush testified that for the first year after the accident, he used crutches or a wheelchair 90% of the time; he could bear weight on the leg for about two months of the year. (Tr. 719). He reported that he used crutches or a wheelchair about 10 months of the second year after the accident. (Tr. 720). He currently only had to use crutches or a wheelchair if he had over-exerted himself. (Tr. 722). He testified that, as long as he could control his pain by elevating his leg, he did not take pain medication, except for limited

periods after surgeries. (Tr. 720). Bush would elevate his leg for a half-hour after an hour of work in order to relieve his pain. (Tr. 721). He testified that if he did not elevate his leg, the pain would increase to the level of eight or nine on a scale of ten. (Tr. 722). Bush attended hour-and-a-half physical therapy sessions three times a week, after which he had to elevate his leg. (Tr. 720-21). However, he had recently stopped attending the sessions, as the physical therapist felt that it was not improving his mobility. (Tr. 721). Bush's doctor planned to perform more surgeries on his arm and leg, after which he would return to physical therapy. (Tr. 722). The ALJ questioned Bush about his statement that he didn't take pain medication, to which Bush replied that he didn't "like taking too much of those or anything like that," and that pain medication also was hard on his stomach, so he preferred to elevate his leg to handle the pain. (Tr. 723).

The ALJ then questioned the vocational expert, Dr. Magroski. (Tr. 724). Dr. Magroski described Bush's previous work. (Tr. 725). The ALJ then asked Dr. Magroski whether a person of Bush's age, education, and work experience, who could perform only sedentary work with only occasional climbing, balancing, stooping, crouching, kneeling, or crawling, and only occasional ladders, ropes, scaffolds, moving machinery, and unprotected heights could perform any of the work that Bush had previously performed or would have any transferable work skills. (Tr. 725-26). Dr. Magroski answered that such a person could not perform any of Bush's previous work and would not have any transferable work skills. (Tr. 726).

Dr. Magroski then testified that an individual like the one described in the hypothetical could perform unskilled, sedentary work, such as an order clerk, a charge account clerk, and an assembler. (Tr. 726). Upon questioning by Plaintiff's attorney, Dr. Magroski testified that these and all other jobs would be unavailable to the hypothetical employee if he also needed to take several unscheduled rest periods of at least 10 to 15 minutes, during which he would need to lie down, recline, or elevate his leg. (Tr. 727).

## ALJ'S DECISION

The ALJ issued his decision on April 9, 2009, denying Plaintiff's claim for benefits. (Tr. 14-21). In doing so, he utilized the five-step sequential evaluation process common to Social Security benefits determinations. 20 C.F.R. 404.1520(a). The steps are: (1) whether Plaintiff is engaged in substantial gainful activity, 20 C.F.R. 404.1520(b); (2) whether Plaintiff has a medically determinable impairment that is "severe" or a combination of impairments that are "severe," 20 C.F.R. 404.1520(c); (3) whether Plaintiff's impairments or combination of impairments meets or medically equals the criteria of an impairment, 20 C.F.R. 404.1520(d); (4) whether Plaintiff has the Residual Functional Capacity (RFC) to perform the requirements of his past relevant work, 20 C.F.R. 404.1520(f); and (5) whether Plaintiff is able to do any other work considering his: RFC, age, education, and work experience, 20 C.F.R. 404.1520(g). If it is determined that Plaintiff is or is not disabled at any step of the evaluation process, the evaluation does not go on to the next step. (Doc. 4 at 12).

After generally reviewing Bush's medical history and testimony, the ALJ found that Bush had one or more "severe" impairments, but that none of them, either alone or in combination, met or equaled the severity of one of the Listings of impairments in Appendix 1 to Subpart P of Part 404 in Title 20 of the Code of Federal Regulations. (Tr. 16). The ALJ then more-particularly described Bush's treatment history and Dr. Wheeler's opinions, and determined that Bush was not able to perform any of his past relevant work, which was "heavy" in exertional level, and that he had no usable transferable skills. (Tr. 17). The ALJ found that Bush had the RFC to perform sedentary work allowing lifting and carrying of 10 pounds frequently and 20 pounds occasionally, but not requiring climbing of ropes, ladders, or scaffolds; no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; and not having concentrated or excessive exposure to unprotected heights or dangerous moving machinery. This RFC would include only occasional walking and standing. (Tr. 17).

The ALJ then noted that the vocational expert had testified that an RFC with these limitations would allow Bush to work in a substantial number of jobs. (Tr. 18). The vocational expert had testified, upon questioning by Plaintiff's attorney, that these jobs would be eliminated if Bush had to take additional unscheduled breaks to elevate his leg. However, the ALJ determined that there was no documented need to take these breaks to elevate his leg, and so this was not a necessary limitation on Bush's RFC. (Tr. 18).

The ALJ explained that, while the opinion of a treating physician is normally entitled to great weight, he did not give such weight to Dr. Wheeler's June 2, 2007

and February 22, 2009 assessments of Bush's abilities, as they were inconsistent with Dr. Wheeler's own treating records. Further, these assessments were undermined by the facts that Bush was exercising by July 2007, was walking without crutches after additional surgery in October 2008, had never used crutches for months at a time, and had received unemployment benefits after his accident. The last fact, though not conclusive proof of ability to work, was "inconsistent with the allegation of disability because to qualify for such benefits a claimant must legally assert that he is willing and able to work." (Tr. 18). The ALJ further noted that Bush had no significant, uncontrollable side effects from his medication, that he took no prescription pain medication at the time of the hearing, that he engaged in "a fair range of normal activities," that he had no documented evidence of nonexertional pain that affected Bush's ability to concentrate, and that Dr. Wheeler had not instructed Bush that he still needed to elevate his legs as often as Bush claimed. (Tr. 18-19). Finally, the ALJ found, based on the absence of any record evidence, that Bush had no "credible, medically-established mental or mood disorder that would prevent him from doing ordinary work." (Tr. 19).

The ALJ concluded that, in light of all of these considerations, Bush's allegations of disabling impairments were not credible, and that there had never been a continuous 12-month period during which Bush could not have performed sedentary work within his RFC. (Tr. 19). As he could have performed such work, and as such work existed in sufficient numbers in the national economy, according to the vocational expert, Bush was not disabled.

To be entitled to disability benefits under the Social Security Act, a claimant must prove that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements of one of the Listings are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv).

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the

claimant's RFC is evaluated to determine whether the claimant can pursue his past work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v). The claimant has the burden to prove disability through step four of the analysis, *i.e.*, he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform his past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id.*

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court must ensure that the Commissioner "build[s] an accurate and logical bridge from the evidence to his conclusion," even though he need not have addressed every piece of evidence. *Id.* at 872.

Plaintiff argues that the ALJ erred in four ways: (1) failing to accord adequate weight to the opinion of Bush's treating physician, Dr. Wheeler; (2) making a patently erroneous credibility finding; (3) failing to support his RFC finding with substantial evidence; and (4) failing to pose a hypothetical to the vocational expert that included the limitations that are documented in the record. (Doc. 10 at 8).

## 1.   Weight given to opinion of treating physician

Plaintiff complains of the fact that the ALJ did not give controlling weight to Dr. Wheeler's opinion, given in June 2007 and February 2009, that Bush was unable to engage in sedentary work. His primary reason for determining that Dr. Wheeler's opinion was not due controlling weight was that it was "inconsistent with his own clinical treatment records, which do not show fractures of the kinds of intense duration contemplated by Section 1.06 and 1.07 of Appendix 1, and which do show fairly progressive interval healing of all fractures."[2] (Tr. 18). The ALJ also appears to have relied on the facts that also support both his RFC assessment and his finding that Bush was not credible, which are further discussed below.

First, the ALJ noted that Dr. Wheeler's treating notes and tests indicate that Bush's fractures would not meet the requirements of Listings 1.06 and 1.07 of Appendix 1, and that they showed "fairly progressive healing" – to the ALJ, this

---

[2]     Defendant states that Dr. Wheeler's June 2007 and February 2009 opinions were given "simultaneously" with Dr. Wheeler giving Bush work release notes. (Doc. 14 at 6). On the contrary, the work releases cited by Defendant were given in January and April of 2008. (Tr. 340 & 338). At the least, Dr. Wheeler's June 2007 opinion that Bush would not be able to work until sometime after December 23, 2007 is consistent with his advice to Bush himself.

rendered them inconsistent with Dr. Wheeler's June 2007 and February 2009 assessments of Bush's ability to work. (Tr. 18). The fact that a Listing's severity is not met or equaled does not mean that a claimant can work, though; a claimant can be unable to work even though his impairments do not meet the requirements of a Listing. The finding that Dr. Wheeler's notes do not show Bush to have met a Listing therefore does not reasonably undermine Dr. Wheeler's opinion that Bush could not meet the requirements of sedentary work, as those two findings result from separate analyses.[3]

The Court agrees with the ALJ's assessment of Dr. Wheeler's opinion as to the period beginning January 28, 2008. On that date, Dr. Wheeler gave Bush a note allowing him to return to a modified work program. Throughout 2008 and up to the March 2, 2009 hearing, Bush's condition appears from the record to have been much improved, though he had a setback, from which he quickly recovered, in the late summer of 2008; after an August 22, 2008 surgery, Dr. Wheeler's notes indicate that he was again walking without crutches by October. In order to grant benefits, there must be a continuous 12-month period of disability, which did not exist after

---

[3]    On the other hand, Plaintiff argues, almost as an afterthought, that Bush "might" have met Listing 1.06. (Doc. 10 at 14). Under 20 C.F.R. §§ 404.1526(e) and 416.926(e), the question of whether a Listing is met or equaled is a legal issue reserved to the ALJ, and it is Plaintiff's burden to show that his impairment meets or equals the requirements of a Listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (*citing Maggard*, 167 F.3d at 380). Listing 1.06 requires both that there is no evident "[s]olid union…on appropriate medically acceptable imaging," *and* an "[i]nability to ambulate effectively" for at least 12 continuous months. As the Court does not have the medical images and would not be qualified to review them even if it did, it cannot address the first element, but, reviewing the medical records, there was no continuous 12-month period after December 23, 2006 during which Bush was unable to ambulate effectively, as defined by Listing 1.00(B)(2)(b). The use of a single cane does not indicate an inability to ambulate effectively.

January 28, 2008. Even Dr. Wheeler's advice to Bush beginning in January 2008 was that he increase his activity, progress to bearing his full weight on his legs, and, significantly, return to work. Dr. Wheeler's advice from that point on was inconsistent with Dr. Wheeler's stated opinion that Bush could not work. This inconsistency, coupled with the substantial evidence the ALJ had to determine that Bush had an RFC allowing sedentary work after January 2008, discussed below, was sufficient to allow the ALJ to reject Dr. Wheeler's opinion that Bush could not work.

Between December 23, 2006 and January 27, 2008, though, there is nothing that directly contradicts Dr. Wheeler's opinion that Bush was unable to meet the requirements of sedentary work, aside from Dr. Bone's RFC assessment in 2007. Though Dr. Bone's opinion was entitled to weight as that of a state agency physician, the opinion of a doctor who examines and treats the patient is entitled to more weight than the opinion of a doctor who does not. 20 CFR § 404.1527(d). Even if Dr. Wheeler's opinion was not entitled to controlling weight because of the conflict with Dr. Bone's opinion, it is clear that it should be given more weight than Dr. Bone's. All of the relevant factors used in assessing the weight to be given to a treating physician's opinion, including the nature of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the reliability of the opinion point in Dr. Wheeler's favor. 20 CFR § 404.1527(d)(2). As further discussed below, the record evidence also indicates that Dr. Wheeler's assessment of Bush's condition from December 23, 2006 through 2007 was worthy of acceptance.

## 2. ALJ's evaluation of Bush's credibility

The Court will not disturb an ALJ's credibility findings "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). Here, the ALJ did not find Bush's description of his inability to work and need to take breaks to be credible, to the extent that it was inconsistent with the ALJ's RFC determination. As reasons for his credibility finding, the ALJ cited Bush's application for and receipt of unemployment benefits immediately following his accident, the fact that Bush was not taking pain medication at the time of the hearing and that he did not suffer any uncontrollable side effects from any medications, the record's demonstration of Bush's ability to walk with only occasional assistance from a cane or other assistive device, Bush's engaging in "a fair range of normal activities," and the fact that there is no evidence that Dr. Wheeler instructed Bush to frequently elevate his leg for long periods of time. Each of these reasons is supported by the record and is a reasonable basis for discounting Bush's allegations.

The Court agrees with the ALJ that an application for unemployment benefits is "inconsistent with the allegation of disability because to qualify for such benefits a claimant must legally assert that he is willing and able to work." (Tr. 18). *See Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994) ("[I]n order to be eligible for unemployment benefits, Barrett was required to sign documents stating that he was capable of working and seeking work. This statement is clearly inconsistent with Barrett's claim of disability during the same period."). Further, in July 2007, even Dr. Wheeler felt that Bush should progress to fully bearing weight on his

injured leg, negating the claim that he was medically required to use an assistive device during that period. (Tr. 348). In addition, the Court has reviewed the record, and, like the ALJ, finds no indication that Dr. Wheeler told Bush to frequently elevate his leg for extended periods of time; indeed, there is no indication that Bush told Dr. Wheeler that he was dealing with his pain in this way, or even that he was experiencing such frequent episodes of pain.[4] The ALJ's observations that Bush was not taking pain medication and that he engaged in "a fair range of normal activities" at the time of the hearing are only applicable to the period of time surrounding the hearing itself, but do buttress the ALJ's determination that Bush's testimony as to the disabling nature of his symptoms was not credible. Thus, the ALJ decision to discredit Bush's testimony was not patently erroneous.

### 3.   ALJ's RFC determination

The ALJ found that Bush had the RFC to perform sedentary work allowing lifting and carrying of 10 pounds frequently and 20 pounds occasionally, but not requiring climbing of ropes, ladders, or scaffolds; not doing more than occasional climbing of ramps and stairs, or balancing, stooping, kneeling, crouching, or crawling; not having concentrated or excessive exposure to unprotected heights or dangerous moving machinery; and requiring only occasional walking and standing. (Tr. 17). As explained above, the Court finds that the ALJ was not justified in discounting Dr. Wheeler's opinion for the period between December 23, 2006 and

---

[4]   Plaintiff argues that Dr. Wheeler did not make note of this instruction because it would be "akin to noting in a medical record that you told a person complaining of fatigue to take a nap." (Doc. 10 at 19). On the contrary, the most obvious treatment for Bush's alleged leg pain is not necessarily to elevate the leg multiple times a day for extended periods of time.

January 28, 2008, but that, after January 28, 2008, the ALJ's reasons for not giving Dr. Wheeler's opinions controlling weight are sound. Likewise, the Court finds that, as to the period after January 28, 2008, the ALJ's RFC finding was supported by substantial evidence, while it was not supported for the period prior to January 28, 2008.

Before turning to Bush's physical limitations, the Court must address Plaintiff's argument that the ALJ should have further developed the record concerning Bush's allegations of depression and anxiety. (Doc. 10 at 16). At the hearing, the ALJ asked Bush whether he took any medication, which is when Bush testified that he was on Zoloft and Xanax for depression and anxiety. (Tr. 712-13). Later in the hearing, the ALJ asked Bush how long he had had depression, and Bush testified that he had been depressed since the accident. (Tr. 715). In response to the ALJ's question, Bush also testified that the medications were effective at controlling his anxiety and depression. (Tr. 716). He said that he had had two or three panic attacks prior to taking Xanax, but that Xanax had effectively stopped them. (Tr. 716). Finally, Bush testified that he was not under the care of a psychiatrist or psychologist. (Tr. 716). This line of questioning, coupled with Plaintiff's attorney's failure to further question Bush or to submit records relating to Bush's mental health, satisfied the ALJ's duty to develop the record. *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988) (citing *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987) ("ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case."). Likewise, the ALJ's thorough and reasoned consideration of Bush's claim of

anxiety and depression was certainly sufficient to satisfy his duty to explain his determination that Bush's anxiety and depression were not disabling. (Tr. 19).

Other than Dr. Bone's prospective May 14, 2007 assessment that Bush would be able to work by December 23, 2007, based only on a review of Bush's records, there is no record evidence indicating that Bush was able to work prior to January 28, 2007; the only other evidence that exists as to Bush's abilities, Dr. Wheeler's records and opinion, indicates that he could not work. As discussed above, under the regulations, Dr. Wheeler's opinion was entitled to more weight than that given to Dr. Bone's. The only contrary evidence cited by the ALJ relating to this period was a listing of Bush's surgical history with Dr. Wheeler and a notation that he "was exercising."[5] (Tr. 16-17). However, merely noting that certain of Bush's fractures were healing or that he was in physical therapy does not give any indication of his ability to work; the only evaluation of Bush's actual abilities during this time, from Dr. Wheeler in June 2002, indicates that he could not work. Therefore, the ALJ did not have substantial evidence from which to determine that Plaintiff had the RFC to perform sedentary work.

However, as to the period after January 2008, when even Dr. Wheeler believed that Bush could work, the ALJ's RFC finding was supported by substantial evidence. Bush was not taking pain medications, indicating that his pain was not severe, did not suffer any diminished ability to concentrate due to pain, and did not suffer any uncontrollable side effects from the medications he did take. *See Donahue*

---

[5]     It is apparent from the record that the ALJ's "exercise" refers to Bush's physical therapy. The fact that a claimant is engaged in physician-ordered physical therapy does not itself show or even suggest that he is able to work.

*v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) (finding relief with over-the-counter pain medication indication that pain not severe). He did not require an assistive device to walk, and even Dr. Wheeler felt that he should begin bearing weight on his injured leg as early as July 2007. Bush's testimony showed that he "maintain[ed] a fair range of normal activities," indicating that he was capable of handling the demands of sedentary work. (Tr. 19). Bush had testified that he could do housework, shop for groceries, weed his garden, walk the perimeter of his three and a half acre property, stand for a half-hour, lift 10-20 pounds with his injured arm (and was not limited on the amount he could lift with his left arm), and, with some modification, pick up items from the floor and climb stairs. Finally, there was no record indication of any advice from Dr. Wheeler or any other source that Bush needed to frequently take time out of the work day to elevate his leg for extended periods. Each of these findings by the ALJ is supported by the evidence, and, together, they reasonably lead to the conclusion that Bush was capable of the demands of sedentary work, with the applicable restrictions found by the ALJ, after January 2008.

### 4. Hypothetical posed to the vocational expert by ALJ

Finally, Plaintiff argues that the ALJ's hypothetical to the vocational expert was inadequate because it assumed some abilities that Plaintiff asserts Bush did not have, and failed to include some of Bush's alleged impairments.[6] Plaintiff

---

[6] Plaintiff wishes that the ALJ had limited the hypothetical worker proposed to the vocational expert to never climbing, balancing, kneeling, crawling, climbing ladders, climbing ropes, climbing scaffolds, or being near unprotected heights, and to needing additional breaks, alternation between sitting and standing, and missing more than three days a month due to pain or treatment. (Doc. 10 at 20).

argues both that the incorrect hypothetical undermined the vocational expert's testimony and therefore the ALJ's decision based upon it, and that the inclusion of the correct limitations would have precluded any work. The Court agrees that the ALJ erred in relying on the vocational expert's testimony, but for different reasons than those asserted by Plaintiff.

At the hearing, the ALJ asked the vocational expert if there were jobs for a person of Bush's age, education, and experience who could perform only sedentary work with only occasional climbing, balancing, stooping, crouching, kneeling, or crawling, and only occasional ladders, ropes, scaffolds, moving machinery, and unprotected heights. (Tr. 725-26). He specifically asked the expert to rely only on the hypothetical in considering the limitations to apply, not on what he had learned from the record and testimony. (Tr. 725). The vocational expert replied that there would be work available to such a person, and listed three representative jobs that exist in sufficient numbers in the national economy. (Tr. 726). In his opinion, though, the ALJ found that Bush had the RFC to perform sedentary work not requiring climbing of ropes, ladders, or scaffolds; no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; not having concentrated or excessive exposure to unprotected heights or dangerous moving machinery; and requiring only occasional walking or standing. (Tr. 17).

These two RFCs differ from one another in that the vocational expert's testimony was based on the worker being able to handle "*occasional* ladders, ropes, scaffolds," while the RFC as found by the ALJ required *no* ladders, ropes, or scaffolds. In the ALJ's opinion, he determined that the evidence showed that Bush

could not handle ladders, ropes, or scaffolds. As the vocational expert relied in determining that there were sufficient jobs for Bush on an RFC that included more abilities than those the ALJ found to be supported by the evidence, the ALJ could not rely on his testimony in finding that there were sufficient jobs that Bush could do, such that Bush was not disabled – the hypothetical was "fundamentally flawed" in that it included abilities that the ALJ later determined Bush did not have. *Young v. Barnhart*, 362 F.3d 995, 1005 (7th Cir. 2004) ("When the hypothetical question is fundamentally flawed because it…does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand.").

## CONCLUSION

The Court finds that, as for the period between January 28, 2008 and March 2, 2009 the ALJ's RFC determination for Bush was supported by substantial evidence. However, as for the period between December 23, 2006 and January 28, 2008, the ALJ's RFC determination for Bush was not supported by substantial evidence. In addition, the ALJ erred in relying on the testimony of the vocational expert in determining that there were jobs available that Bush could perform, as the hypothetical posed to the vocational expert was flawed. Each of these errors requires reversal of the agency decision, and a remand for further consideration.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 10) is GRANTED IN PART AND DENIED IN PART, and Defendant's Motion for Summary Affirmance (Doc. 13) is DENIED. The decision of the Commissioner of Social Security is REVERSED and this case is REMANDED

pursuant to sentence four of 42 U.S.C. § 405(g) for a determination of Bush's RFC for the period between December 23, 2006 and January 28, 2008. The ALJ SHALL also determine whether Bush was disabled during all or part of the entire alleged period of disability by assessing whether jobs existed in the national economy that Bush could have performed.

CASE TERMINATED.


Entered this 25th day of October, 2011.


                              s/ Joe B. McDade
                            JOE BILLY McDADE
                    United States Senior District Judge